# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

DONALD YORK EVANS et al.

    Plaintiffs,

vs.

HOWARD SKOLNIK et al.,

    Defendants.

3:08-cv-00353-RCJ-CBC

**ORDER**

This case arises out of the monitoring of prisoners' telephone calls. Pending before the Court is a motion for summary judgment. For the reasons given herein, the Court grants the motion.

**I.    FACTS AND PROCEDURAL HISTORY**

Plaintiffs Donald York Evans and John Witherow filed the Complaint in this case in June 2008 alleging that Defendants illegally intercepted privileged communications between Attorney Evans and his client, Withrow, who was in the custody of the Nevada Department of Corrections ("NDOC"). Plaintiffs listed several Defendants and many causes of action. Other judges of this District ruled on various pretrial motions, dismissing or summarily adjudicating most of the claims. The case was reassigned to this Court for trial. The jury returned a verdict for

Defendants. Plaintiffs appealed. The Court of Appeals affirmed in all respects but one: it reversed and remanded as to the Fourth Amendment claim, which had been determined on motion practice before the case was reassigned to this Court for trial. The Court of Appeals directed that the Court should reexamine the Fourth Amendment claim under the "normative inquiry" approach, *see United States v. Scott*, 450 F.3d 863, 867 (9th Cir. 2005), not the "reasonable expectation of privacy" approach, with appropriate deference to Defendants under *Turner v. Safley*, 482 U.S. 78 (1987). The Court conducted the required analysis based on the existing record and entered judgment in favor of Defendants. The Court of Appeals reversed and remanded, ruling that Plaintiffs should have been given a chance to file new briefs before the Court ruled. Plaintiffs took no action for over a year after the mandate issued. Accordingly, Defendants moved to dismiss for lack of prosecution. The Court denied that motion but ordered any party wishing to move for summary judgment to do so within twenty-one days. Only Baker has filed a motion. Connally has died, and there is no known successor.

**II.    LEGAL STANDARDS**

A court must grant summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those which may affect the outcome of the case. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *See id.* A principal purpose of summary judgment is "to isolate and dispose of factually unsupported claims." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).

In determining summary judgment, a court uses a burden-shifting scheme. The moving party must first satisfy its initial burden. "When the party moving for summary judgment would bear the burden of proof at trial, it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial." *C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (citation and internal quotation marks omitted). In contrast, when the nonmoving party bears the burden of proving the claim or defense, the moving party can meet its burden in two ways: (1) by presenting evidence to negate an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial. *See Celotex Corp.*, 477 U.S. at 323–24.

If the moving party fails to meet its initial burden, summary judgment must be denied and the court need not consider the nonmoving party's evidence. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970). If the moving party meets its initial burden, the burden then shifts to the opposing party to establish a genuine issue of material fact. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). To establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 631 (9th Cir. 1987). In other words, the nonmoving party cannot avoid summary judgment by relying solely on conclusory allegations unsupported by facts. *See Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). Instead, the opposition must go beyond the assertions and allegations of the pleadings and set forth specific facts by producing competent

evidence that shows a genuine issue for trial. *See* Fed. R. Civ. P. 56(e); *Celotex Corp.*, 477 U.S. at 324.

At the summary judgment stage, a court's function is not to weigh the evidence and determine the truth, but to determine whether there is a genuine issue for trial. *See Anderson*, 477 U.S. at 249. The evidence of the nonmovant is "to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255. But if the evidence of the nonmoving party is merely colorable or is not significantly probative, summary judgment may be granted. *See id.* at 249–50. Notably, facts are only viewed in the light most favorable to the nonmoving party where there is a genuine dispute about those facts. *Scott v. Harris*, 550 U.S. 372, 380 (2007). That is, even if the underlying claim contains a reasonableness test, where a party's evidence is so clearly contradicted by the record as a whole that no reasonable jury could believe it, "a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Id.*

**III. ANALYSIS**

As the Court of Appeals has ruled, Plaintiffs' expectation of confidential attorney–client communications cannot have been destroyed by subjective knowledge that attorney–client communications had been compromised by monitoring. *See Scott*, 450 F.3d at 867 (quoting *Smith v. Maryland*, 442 U.S. 735, 740 n.5 (1979)). However, the legitimate penological interest of ensuring that the right to confidential attorney–client communications is not abused makes it constitutionally reasonable to conduct an initial examination of an inmate's purported legal call just long enough to determine that the call is in fact a legal call.[1] At a minimum, the law at the

---

[1] The evidence at trial indicated that pre-monitoring ended the moment a call was identified as a legal call. *See infra.* The Court previously addressed the issue of intermittent monitoring or

time of the events at issue in this case did not clearly indicate a contrary rule (and it still does not).

Prison regulations generally survive constitutional challenges if they are "reasonably related to legitimate penological interests." *Turner*, 482 U.S. at 89. The right at issue "must be exercised with due regard for the 'inordinately difficult undertaking' that is modern prison administration." *Thornburgh v. Abbott*, 490 U.S. 401, 404 (1989) (quoting *Turner*, 482 U.S. at 85). The *Turner* factors are: (1) whether the regulation is rationally related to a legitimate and neutral objective; (2) whether there are alternative means of exercising the right at issue; (3) the impact the requested accommodation will have on other inmates and prison staff; and (4) the existence of obvious, easy alternatives. *Id.* at 414–18.

First, there is a legitimate penological interest in ensuring that the ability to make non-monitored calls is not abused, i.e., is not used except when speaking with an attorney about legal matters. Second, there are alternative means of exercising the right to confidential attorney–client communications. Inmates may speak with their attorneys at NDOC prisons face-to-face under circumstances where there is no monitoring of the conversations at all, because the prison is able to confirm before the conversation begins that the non-prisoner participant is in fact an attorney. They may also send legal mail that may not be "read" but only "inspected." Moreover, the initial monitoring of legal calls to ensure they are legal calls gives the inmate the simple

---

"check-ins" to ensure a call was still a legal call, but a closer examination of the trial evidence shows such a claim is not supported, and the parties introduce no new evidence of such a practice but simply cite to the trial record. Baker only ever testified to pre-monitoring long enough to ensure a purported legal call was in fact a legal call and checking in intermittently just long enough to hear if a call was still ongoing to clear the line for a new inmate call, not to examine the substance of a call.

option of telling the attorney at the beginning of the conversation to identify himself as an attorney, at which point the monitoring will end without the monitor hearing any legal substance at all. Third and fourth, there are no obvious, easy alternatives, and ending the practice could destroy the ability of prison staff to prevent abuses, because confirming the recipient of the call is an attorney is the only feasible way, and probably also the least intrusive way, to ensure the right of privileged communications may be enjoyed without being abused short of permitting only in-person communications in the prison itself with pre-screened attorneys or sending prison guards to attorney's offices to confirm the identity of the call recipient. The former alternative would destroy the right of prisoners to make confidential telephone calls from prison, and the latter alternative would be prohibitively expensive and time consuming.

Even without the above analysis, the Court of Appeals has recently spoken to the issue in a highly analogous context, explicitly ruling that the contents of legal mail, not only the exterior of the envelope, may be "inspected." *Nordstrom v. Ryan (Nordstrom I)*, 762 F.3d 903, 909 (9th Cir. 2014) (quoting *Wolff v. McDonnell*, 418 U.S. 539, 577 (1974)). That is, prison officials may "inspect" or "scan" but not "read" legal mail:

> Corrections officials obviously have good reason to be on the lookout for contraband, escape plans, and other mischief that could jeopardize institutional security. Officials likewise have every right to inspect an inmate's outgoing legal mail for such suspicious features as maps of the prison yard, the times of guards' shift changes, and the like. Prison officials know what to look for. But inspecting letters and reading them are two different things, as the Supreme Court recognized in Wolff v. McDonnell. What prison officials don't have the right to do is read a confidential letter from an inmate to his lawyer. This is because it is highly likely that a prisoner would not feel free to confide in his lawyer such things as incriminating or intimate personal information—as is his Sixth Amendment right to do—if he knows that the guards are reading his mail.
>
> Reading legal mail—not merely inspecting or scanning it—is what Nordstrom alleges the Department of Corrections is doing, and it is what he seeks

to enjoin. We hold today that his allegations, if true, state a Sixth Amendment violation.

*Id.* at 906 (citation omitted). This case presents a straightforward application of *Nordstrom*'s distinction between "inspecting" or "scanning" and "reading" inmate communications in the context of telephone calls. The Court of Appeals later held that a "page-by-page content review" of inmate legal mail is not permitted. *Nordstrom v. Ryan (Nordstrom II)*, 856 F.3d 1265, 1271–72 (9th Cir. 2017) (distinguishing *Nordstrom I*'s permitted inspections). The inspection must be for "'suspicious features' that can readily be identified without reading the words on a page." *Id.* at 1272. Some of the permitted "cursory visual inspection" may require reading what is written, however, such as times of guards' shift changes, "and the like." *Id.* The *Nordstrom II* court found that inspecting for "anything deemed [ ] to be a security threat or safety threat to [ ] staff or [ ] inmates" was too broad. *Id.*

> At most, a proper inspection entails looking at a letter to confirm that it does not include suspicious features such as maps, and making sure that illegal goods or items that pose a security threat are not hidden in the envelope. ADC's legal mail policy does not meet this standard because it requires that prison officials "verify that [the letter's] contents qualify as legal mail."

*Id.* A telephone call cannot of course include the transmission of illegal items, but it may include "suspicious features." It appears under *Nordstrom II* that a prison may "inspect" a legal telephone call not to determine whether it in fact concerns legal matters but only for "suspicious features." Some such features might be whether the call has been forwarded, whether the call has been placed on speakerphone, whether a non-lawyer has joined the call, or other aspects of the call indicating an abuse of non-monitored calls.

It is difficult to reconcile *Nordstrom II*'s conclusion that only suspicious features of (as opposed to the substantive contents of) legal communications may be inspected with *Nordstrom*

*I*'s approval of inspection for things like the times of guards' shift changes, as further confirmed in *Nordstrom II*. To the extent there were any inconsistency, the earlier case, *Nordstrom I*, would control. *Miller v. Gammie*, 335 F.3d 889, 899 (9th Cir. 2003) (en banc). A map is easy to identify without reading text. The human mind can quickly distinguish between a drawing and text without reading the text. That is not true, however, with some of the other things the *Nordstrom II* court (citing *Nordstrom I*) appears comfortable permitting prison officials to inspect for. For example, unless conspicuously displayed via a chart, identifying the times of guards' shift changes in a letter would require that an inspector inspect the substance of, i.e., read, the letter. Times buried in a page of text would not naturally leap out at a reader as a suspicious feature, especially if the numbers were written with words, as opposed to numerals. But the cases appear to permit an inspection for this kind of information. The rule cannot be that a prison official may not inspect the substance of a letter at all to determine its legal character, except for "the times of guards' shift changes and the like." The latter category of information is permitted to be inspected for but cannot usually be discovered except by examining the substance of the letter, at least in cursory fashion. Judge Bybee noted this tension in *Nordstrom I*. 762 F.3d at 916–17 (Bybee, J., dissenting) (explaining that inspecting a letter even for limited categories of things necessarily requires reading its contents, and opining that such is constitutionally permitted in the context of prison legal mail). The *Nordstrom* cases hold that legal mail may not be read straight through for a general distinction between legal and non-legal content but may be "inspected" for suspicious things, whether obvious (maps) or less obvious (times of shift changes "and the like"). *Nordstrom I*, 762 F.3d at 906.

The question here is the breadth of Baker's practice during the relevant times. Baker argues that her pre-monitoring was designed to prevent inmates from making calls to non-attorneys masked as legal calls, which had been a problem, and that the policy in fact only involved pre-monitoring, not periodic check-ins. Baker testified at trial that inmate calls were only "monitored up until the point where I can determine that he has actually called an attorney's office." (Trial Tr. 274, ECF No. 351). This practice could not chill an inmate's right to privately confer with counsel, *Nordstrom I*, 762 F.3d at 911, because an inmate who is aware of the procedure would have no reason to think his communications were monitored after the recipient of a call has identified himself as an attorney (or an employee of an attorney's office). He can assure himself of confidentiality by not revealing any confidential information until the identity of the recipient has been announced. And although an inmate may have a subjective fear that an official might monitor his entire call, that possibility exists in the absence of any pre-monitoring procedure, just as there is always the possibility a prison official may surreptitiously open legal mail outside an inmate's presence or record a face-to-face meeting with an attorney. No evidence was adduced at trial indicating that Baker ever listened beyond "the point where [she could] determine that he has actually called an attorney's office." The Court cannot find a chilling effect based on a fear for which the evidence provides no basis beyond that necessarily existing in all cases, i.e., the mere possibility of official malfeasance. The deference due to prison officials under *Turner* does not permit the Court to mandate a more specific procedure, such as preclearing certain telephone numbers and then refraining from pre-monitoring calls made to those numbers forever thereafter. There is a legitimate penological interest in the individual examination of calls to ensure they are being made to an attorney before permitting

them to continue unmonitored. The simple preclearance of a telephone number does not obviate that interest.

In response, Plaintiffs claim that between May 8, 2007 and July 25, 2008, Baker used a "rogue" device to tap into the telephone system and monitor Plaintiffs' calls in a way that not even former Warden Donat could do with his equipment. But there is no evidence in the record of Baker ever using any unauthorized device. It is true that Baker's local equipment had capabilities that Donat's general monitoring equipment did not, but that equipment was authorized precisely because of its additional capabilities. That is, only calls that were recorded (which excluded calls made to precleared legal numbers) could be monitored by Donat or anyone else through the general monitoring system. Plaintiffs cite to several parts of the transcript in support of the "rogue" monitoring argument. (Resp. 7:17–20, ECF No. 387). But the cited portions of the transcript only show various witnesses' testimony of the existence of calls made between Plaintiffs, Baker's monitoring of personal (non-legal) calls, Baker's pre-monitoring of legal calls up to the point where it was evident that the inmate had actually called an attorney's office, that the device used by Baker to pre-monitor legal calls in Unit 13 was not an unauthorized or "rogue" device but an integral part of the telephone monitoring system, and that Baker would sometimes flip on her monitor just long enough to hear if anyone were still speaking in order to check if the phone was free when another inmate needed to use it. There is no evidence of Baker ever using any unauthorized devices or "checking in" on calls to confirm

their continued legal character after initially determining the calls were made to an attorney's office.[2]

The trial evidence cited (no additional evidence has been adduced) only supports the allegation that one or more of Plaintiff's legal calls were monitored until it was evident the calls were made to an attorney, and no further. This is analogous to something more than simply reading the address on the outside of legal mail, but it is certainly not analogous to reading legal mail "page-by-page." Nor is it even analogous to "inspecting" legal mail all the way through. It is most analogous to reading the heading on the first page of a piece of legal mail to ensure the letter has been addressed to an attorney, leaving the remainder of the letter (no matter how extensive) not only unread, but also uninspected. The question is whether the caselaw permits this, or, in the context of qualified immunity, whether it should have been clear to Baker that the caselaw did not permit it.

The cases do not clearly answer the question even today, much less at the time the events in the present case occurred.[3] *Nordstrom I* makes clear that inspections for contraband items and suspicious features are permitted, and *Nordstrom II* makes clear that legal mail cannot be read

---

[2] The Court in its previous order presumed for the sake of argument that the intermittent "check-ins" were made to detect whether a call was still of a legal nature, but the evidence adduced at trial does not in fact support such a finding. The evidence only supports a finding that intermittent "check-ins" were done to detect whether anyone was still speaking on the line at all, in order to clear the line for another call.

[3] In opposition, Plaintiffs argue that *Upjohn Co. v. United States*, 449 U.S. 383 (1981) and *Katz v. United States*, 389 U.S. 347 (1967) (as well as other authority not relevant to a qualified immunity analysis, i.e., not from the Supreme Court or the Court of Appeals) decide the qualified immunity issue here. If that is so, the existence of qualified immunity would be even clearer, because neither *Upjohn* nor *Katz* occurred in the prison context, and even if they had, both cases were decided before *Turner* and *Thornburgh*.

straight through to ensure its pure legal character.  The cases do not address whether legal mail can be read only to the point where it is evident the communication is actually intended for an attorney.  Therefore, it is not clear by analogy even today, much less before the *Nordstrom* cases were decided, that a legal telephone call cannot be monitored to the point where it is evident the call is to an attorney.  All that is clear is that legal mail cannot be "read" from front to back to find anything non-legal (meaning it is now clear for the purpose of qualified immunity in this Circuit that a legal call cannot be monitored from beginning to end for content).  But legal mail can still be "inspected" from front to back for "suspicious features" like maps, shift-change times, "and the like."  If it remains unclear whether the pre-monitoring in this case offends the Fourth Amendment, it cannot have been clear to Baker before the *Nordstrom* opinions issued. *See Saucier v. Katz*, 533 U.S. 194, 201 (2001).  It was not clear at the relevant time (and it is still not clear) that monitoring an inmate's purported legal call only to the point where it is evident the call is to an attorney is prohibited.  Given Judge Bybee's dissent in *Nordstrom I*, it was not even clear at the relevant time that reading an inmate's legal mail straight through was not permitted, although the evidence does not indicate Baker ever did anything analogous to that, anyway. 762 F.3d at 912 (Bybee, J., dissenting).  The Court therefore grants summary judgment to Baker based on qualified immunity. *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

///

///

///

///

///

**CONCLUSION**

IT IS HEREBY ORDERED that the Motion for Summary Judgment (ECF No. 386) is GRANTED.

IT IS FURTHER ORDERED that the Clerk shall enter judgment and close the case.

IT IS SO ORDERED.

DATED: This 7th day of November, 2018.

_____
ROBERT C. JONES
United States District Judge